UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| JENNIFER EBERLE, on behalf of L.E., | Case No. 20-cv-13071 |
| Plaintiff, | Honorable Nancy G. Edmunds<br>Magistrate Judge Elizabeth A. Stafford |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

**REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT (ECF NOS. 16, 17)**

## I.    Introduction

Plaintiff Jennifer Eberle, on behalf of her minor daughter, L.E., appeals a final decision of defendant Commissioner of Social Security (Commissioner) denying L.E.'s application for supplemental security income (SSI) under the Social Security Act.  Both parties have filed summary judgment motions, referred to this Court for a report and recommendation under 28 U.S.C. § 636(b)(1)(B).  After review of the record, the Court **RECOMMENDS** that:

- Eberle's motion (ECF No. 16) be **DENIED**;

- the Commissioner's motion (ECF No. 17) be **GRANTED**; and

- the ALJ's decision be **AFFIRMED** under sentence four of 42 U.S.C.

  § 405(g).

## II.   Background

### A.  L.E.'S Background and Disability Application

Born in October 2017, L.E. was a newborn at the time of her

application.  ECF No. 12, PageID.59.  Eberle alleged that L.E. was disabled

from a congenital diaphragmatic hernia and pulmonary hypoplasia.  *Id.* at

PageID.96.

After the Commissioner denied L.E.'s disability application initially,

Eberle requested a hearing, which took place in September 2019.  *Id.* at

PageID.58.  Eberle testified at the hearing.  *Id.*  In the decision that

followed, the ALJ found L.E. not disabled.  *Id.* at PageID.62.  The Appeals

Council denied review, and the ALJ's decision became the final decision of

the Commissioner.  *Id.* at PageID.42.  Eberle timely filed for judicial review.

ECF No. 1.

### B. The ALJ's Application of the Disability Framework Analysis

A child under the age of 18 will be considered disabled if he or she

"has a medically determinable physical or mental impairment, which results

in marked and severe functional limitations, and which can be expected to

2

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  The Commissioner determines whether a child is disabled by analyzing three sequential steps: (1) whether the child is engaged in "substantial gainful activity"; (2) whether the child has any "severe" impairments; and (3) whether the child's impairment or combination of impairments meets, medically equals, or functionally equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listings).  *See* 20 C.F.R. § 416.924(a); *Barnett ex rel. D.B. v. Comm'r of Soc. Sec.*, 573 F. App'x 461, 462 (6th Cir. 2014).

In analyzing functional equivalence, the ALJ examines the effects of a claimant's impairments on six behavioral domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being.  *Barnett*, 573 F. App'x at 464; 20 C.F.R. § 416.926a(b)(1).  A claimant's impairments "functionally equal the listings" if they cause "'marked' limitations in two domains" or "an 'extreme' limitation in one domain."  § 416.926a(a).

Applying this framework, the ALJ concluded that L.E. was not disabled.  At the first step, he found that L.E. had not engaged in

3

substantial gainful activity since the application date.  ECF No. 12, PageID.59.  Next, the ALJ determined that L.E. had the severe impairments of congenital diaphragmatic hernia (CDH), pulmonary hypoplasia, and hypotonia of the hips.  *Id.*  At the third step, he concluded that L.E.'s impairments did not meet or medically equal the severity of the listed impairments.  *Id.*

The ALJ also concluded that L.E.'s impairments were not the functional equivalent of a listed impairment.  *Id.* at PageID.59-62.  In assessing the six functional equivalence domains, the ALJ found that L.E. had a "marked" limitation in health and physical well-being; a "less than marked" limitation in moving about and manipulating objects; and "no limitation" in acquiring and using information, attending and completing tasks, interacting and relating with others, and the ability to care for yourself.  *Id.* at PageID.60-62.  L.E. was thus found not disabled.  *Id.*

### III.   Analysis

### A.

Under § 405(g), this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made in conformity with proper legal standards.  *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014).

4

Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations.  And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence, this Court has said, is more than a mere scintilla.  It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotation marks omitted).

Eberle argues that the ALJ erred by not finding L.E. markedly limited in the domain of moving about and manipulating objects or extremely limited in the domain of health and physical well-being.  ECF No. 16, PageID.814-816, 820.  Marked limitations in both domains—or an extreme limitation in health and physical well-being—would lead to a finding of functional equivalency, requiring remand.  *See* § 416.926a(a).  The Court disagrees with Eberle and recommends the ALJ's decision be affirmed.

**B.**

A marked limitation is found when an impairment "interferes seriously" with the ability to "independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).  A marked limitation is "more than moderate but less than extreme."  *Id.* (internal quotation marks omitted).  An extreme limitation is found when an impairment "interferes very

seriously" with those abilities.  § 416.926a(e)(3)(i).  An extreme limitation describes the worst limitations but does not necessarily mean a total loss of ability to function.  *Id.*

Examples of limitations in moving about and manipulating objects include muscle weakness, joint stiffness, or sensory loss that interferes with motor activities; trouble climbing up and down stairs, jerky or disorganized movement, or difficulty with balance; difficulty coordinating gross motor movements such as bending, kneeling, crawling, or running; and difficulty with fine motor movement such as gripping or grasping objects. § 416.926a(j)(3).  These "examples do not necessarily describe a 'marked' or 'extreme' limitation."  *Id.*

The ALJ found that L.E.'s hip hypotonia caused a less than marked limitation in her ability to move about and manipulate objects.  ECF No. 12, PageID.62.  He noted that L.E. could run and walk, that her strength had improved with physical therapy, and that she did not require occupational therapy.  *Id.* at PageID.61-62.  These conclusions are supported by substantial evidence.

In October 2018, when L.E. was a year old, her primary care physician, Matthew Waier, M.D., had concerns about L.E.'s motor development.  *Id.* at PageID.754.  Eberle reported that L.E. was just

6

starting to crawl but was not walking and did not like to stand.  *Id.* at PageID.755.  On physical examination, Dr. Waier noted some laxity and mildly decreased muscle tone in L.E.'s legs.  *Id.* at PageID.757.  While other healthcare providers had recommended physical and occupational therapy, Eberle was relying on developmental care through Michigan's Early On program.  *Id.* at PageID.754-755, 759.  Dr. Waier again recommended physical and occupational therapy.  *Id.* at PageID.754.

Two weeks later, L.E. saw physical therapist Kari Alsager.  *Id.* at PageID.668.  Eberle reported that L.E. started crawling when she was a year old, sat up at nine months, and rolled at three or four months.  *Id.* at PageID.668.  She also reported that L.E. had trouble walking and that her legs slid apart when standing.  *Id.* at PageID.669.  On examination, Alsager observed that L.E. sat with her hips in abduction and that she had excessive range of motion in her hips with no evidence of dislocation.  *Id.* at 669, 673.  A test for gross motor skills showed that L.E. was in the fifth to tenth percentile, meaning that L.E. was "demonstrating some age appropriate gross motor skills . . . with a moderate delay, mainly in standing and walking skills."  *Id.* at PageID.671.  Alsager also found that L.E. had "decreased muscle strength and decreased postural control which impacts her ability to access and/or interact with [her] environment, perform age

7

appropriate gross motor skills, participate in developmental play, perform

transitions and transfers and ambulate independently."  *Id.* at PageID.673.

Thus, Alsager recommended one month of physical therapy.  *Id.* at

PageID.673-674.

L.E. also saw occupational therapist Camron Moorehead in October

2018.  *Id.* at PageID.678.  Fine motor testing yielded average results, and a

physical examination was normal.  *Id.* at PageID.679-682.  Moorehead

determined that occupational therapy was unnecessary at that time.  *Id.* at

PageID.683.

At a December 2018 visit to the University of Michigan's

multispecialty clinic, another physical therapist, Katherine Tales, assessed

L.E.  *Id.* at PageID.691-692.  Eberle had not continued L.E.'s outpatient

physical therapy after the October 2018 visit, but L.E. was seeing Early On

as much as possible.  *Id.*  On examination, Tales observed that L.E. could

bear weight through her feet, take steps with a wide base of support, and

come to sitting and standing positions without assistance.  *Id.* at

PageID.692.  Tales also "[n]oted persistent weakness in gluts [sic] with

inability to sustain tall kneeling for longer than a second and preference for

abducted position in which she attempts to stabilize; she continues to have

hypermobility in her hips but her trunk/abdominal strength have improved

8

significantly." *Id.* Gross motor testing showed mild to moderate impairment in locomotion and object manipulation. *Id.* Tales recommended home exercises and hip helpers. *Id.*

In January 2019, Dr. Waier found that L.E.'s "mild gross motor delay" was "much improved." *Id.* at PageID.749. And Melissa Gonzales, an Early On physical therapist, noted that L.E. was "enjoying exploring her environment either by crawling or cruising along surfaces," that she crawled "very well," that she could stand momentarily on her own, and that she was "gaining dexterity as she manipulates book, toys, and household items." *Id.* at PageID.654. Gonzales recommended that crawling should be L.E.'s "primary way of navigating her environment," and that she continue "strengthen[ing] her core for walking and her hands for fine motor activities." *Id.* She also recommended home exercises. *Id.*

L.E. saw Dr. Waier again in June 2019 for gait abnormality. *Id.* at PageID.741. Eberle reported that L.E. had been more active but seemed to have poor balance while walking. *Id.* Dr. Waier found no evidence of weakness and observed L.E.'s activity in the office was normal for a toddler of her age. *Id.* He noted that L.E. fell and got back up with no assistance, was not favoring any side, and walked down the office hallway without falling. *Id.* at PageID.742. He recommended monitoring L.E.'s progress.

*Id.* at PageID.741.  At an Early On visit in July 2019, Gonzales reported that L.E. runs, "climbs on everything," and was working on walking up and down steps.  *Id.* at 731.  Gonzales also noted that the issue with poor balance had resolved.  *Id.*

In August 2019, physical therapist Christopher Tapley evaluated L.E. at the multispecialty clinic.  *Id.* at PageID.780.  He observed that L.E. could transition from either squatting or kneeling to standing unassisted, though she used a wide base of support.  *Id.*  He also observed abdominal weakness and significant pronation with standing and walking.  *Id.*  While Eberle reported that L.E. was toe-walking, Tapley did not observe it at the visit.  *Id.*  Tapley recommended physical and occupational therapy.  *Id.*

L.E. saw physical therapist Elaine Behnke in September 2019.  *Id.* at PageID.787.  Eberle reported that L.E. began crawling at one year old, began walking at 20 months, and could currently walk independently—but would toe-walk 25-30% of the time.  *Id.*  Behnke observed normal posture, normal range of motion in L.E.'s legs, and normal muscle tone.  *Id.* at PageID.788.  L.E. walked with a heel-toe gait pattern for 90% of the visit, and Behnke noticed toe-walking only when L.E. became frustrated or excited.  *Id.*  Overall, Behnke observed that L.E. had decreased muscle strength and impaired balance, impacting her ability to walk on unlevel or

10

graded surfaces or stairs. *Id.* at PageID.791. Thus, she recommended one month of physical therapy and a home exercise program. *Id.*

L.E. saw Moorehead in September 2019 for another occupational therapy assessment. *Id.* at PageID.793. Eberle said that L.E. could pick up small items, complete a shape sorter, and scribble. *Id.* Moorehead observed L.E. use a fork and spoon to feed herself, provide age-appropriate assistance in dressing herself and cleaning up toys, and engage in age-appropriate play. *Id.* at PageID.794-795. Fine motor skill testing showed that L.E.'s grasping abilities were average but that her visual motor integration was poor. *Id.* at PageID.795-796. Morehead also noted visual perception deficits, as L.E. had trouble copying block images. *Id.* at PageID.796. Moorehead recommended a month of occupational therapy. *Id.* at PageID.796-797.

In October 2019, Dr. Waier noted that L.E. was being treated by Early On for concerns about developmental delays and was "doing well." *Id.* at PageID.736. At that visit, Dr. Waier stated that L.E. had passed several developmental milestones, including helping to dress herself, jumping with both feet, kicking a ball, running, scribbling, throwing overhand, and walking stairs. *Id.* at PageID.738. Later in October 2019, L.E.'s Early On

11

service coordinator noted that her motor skills were "more on track."  *Id.* at PageID.727.

This evidence supports the ALJ's determination that L.E. has a less than marked limitation in moving about and manipulating objects.  L.E.'s healthcare providers described her motor skill impairments as mild to moderate and not marked or severe.  *See id.* at PageID.671, 692, 749.  And L.E.'s hip hypotonia, which was first diagnosed in mid-2018, appears to have largely resolved.  *Id.* at PageID.731, 741, 788.  By June and July 2019, L.E.'s providers observed she could walk down a hallway and was running and climbing.  *Id.* at PageID.731, 741.  And by September 2019, L.E. had a normal range of motion and normal muscle tone in her legs.  *Id.* at PageID.787-788.  Just before she turned two, L.E. passed many milestones such as running, jumping, and kicking a ball.  *Id.* at PageID.738.  Thus, the evidence supports the ALJ's finding that L.E.'s motor impairments significantly improved with physical therapy.

There is no medical source opinion in the record showing that L.E. has greater limitations in this domain.  The ALJ's finding that L.E. has a less than marked limitation is more restrictive than state-agency physician William Venema, M.D.'s opinion that L.E. had no limitation.  *Id.* at PageID.100.  Dr. Venema made his May 2018 opinion before L.E. was

evaluated for hip hypotonia and delayed motor skills. Because Dr. Venema did not consider this new evidence, the ALJ properly found a greater limitation. *Id.* at PageID.62; *see Williams v. Comm'r of Soc. Sec.*, No. 19-10753, 2020 WL 4577421, at *7 n.4 (E.D. Mich. Mar. 16, 2020), *adopted,* 2020 WL 2507624 (E.D. Mich. May 15, 2020) (upholding ALJ's finding of greater limitation when the state-agency physician lacked access to later medical records).

Eberle's argument that the ALJ wrongly found that L.E. did not require occupational therapy is off the mark. ECF No. 16, PageID.819. When discussing the October 2018 referral for hip hypotonia, the ALJ noted that L.E. did not then need occupational therapy. ECF No. 12, PageID.61, 683. It was not until October 2019 that occupational therapy was recommended to treat L.E.'s fine motor developmental delay. *Id.* at PageID.793, 796-797.

In sum, Eberle has not shown that L.E. has a marked limitation in moving about and manipulating objects.

## C.

An extreme limitation in health and physical well-being may be found when a claimant is frequently ill or has frequent exacerbations of impairments. 20 C.F.R. § 416.926a(e)(3)(iv). An impairment that qualifies

13

as extreme under this definition "should meet or medically equal the requirements of a listing in most cases."  *Id.*  Deficiencies in this domain can be shown when a child has generalized symptoms such as weakness, dizziness, agitation, lethargy, or psychomotor retardation; somatic complaints such as seizure or convulsive activity, headaches, incontinence, recurrent infections, allergies, changes in weight or eating habits, stomach discomfort, nausea, headaches, or insomnia; or exacerbations from one impairment or a combination of impairments that interfere with physical functioning.  § 416.926a(l)(4).

Here, the ALJ found that L.E. had a marked limitation in health and physical well-being.  ECF No. 12, PageID.62.  He acknowledged that L.E.'s pulmonary hypoplasia, attributable to her CDH, caused difficulty breathing and increased her susceptibility to illness.  *Id.* at PageID.61-62.  But L.E. had surgery to correct the CDH, and multiple sources stated that she was doing well.  *Id.*  The ALJ acknowledged that healthcare providers recommended that L.E. avoid crowded areas because of an increased risk of infection, but he found no evidence of hospital admissions or emergency visits.  *Id.* at PageID.61.  The ALJ also found that L.E.'s gastroesophageal reflux was treated with medication and did not cause functional limitations. *Id.*  Substantial evidence supports these findings.

14

In October 2017, four days after she was born, L.E. had surgery to repair her CDH.  *Id.* at PageID.271.[1]  Although L.E. recovered well from the surgery, she had pulmonary hypoplasia predisposing her to tachypnea (rapid breathing) and to significant respiratory distress if she became ill.  *Id.* at 271, 275.  Because of her susceptibility to severe respiratory illness, Toby Lewis, M.D., prescribed albuterol and recommended avoiding exposure to sick people and crowded places.  *Id.* at PageID.275.

During office visits in November 2017, Dr. Waier stated that L.E. was "doing great" and reported normal findings on physical examination, including normal respiration.  *Id.* at PageID.241-248.  Though L.E. had some gagging and reflux, it was much improved with Zantac.  *Id.* at PageID.242, 246.  Eberle reported a "rattle" in L.E.'s chest, but said it improved with changing positions and elevating L.E.'s head.  *Id.* at PageID.246.  At a November 2017 post-operative follow up visit, Eberle denied that L.E. had any breathing issues, and L.E.'s chest x-ray was stable.  *Id.* at PageID.285-286.  Although a visiting nurse was concerned

---

[1] A CDH "occurs when there is a hole in the diaphragm, which is the thin sheet of muscle separating the chest from the abdomen."  When this gap forms, the bowel, stomach, or liver can move into the chest cavity, limiting space for the lungs and causing respiratory complications.  John Hopkins Medicine, *Congenital Diaphragmatic Hernia*, *available at* https://perma.cc/XJ7Q-EAWH (last viewed June 6, 2022).

that L.E. was underweight, Dr. Waier and Dr. Lewis were satisfied with her weight gain.  *Id.* at PageID.242, 285-286, 430.

In January 2018, L.E. returned for a follow-up visit with Dr. Lewis.  *Id.* at PageID.435.  Although Eberle reported that L.E.'s breath was raspy at times, she said that L.E. never needed albuterol.  *Id.* at PageID.436.  She also reported some gagging with feeding but said that L.E. could recover and keep eating after sitting up and that she had not vomited since starting Zantac.  *Id.*  L.E.'s physical examination was normal, and her weight had climbed to the 21st percentile.  *Id.* at PageID.436-437.  Overall, Dr. Lewis found that L.E. was doing "quite well from a respiratory standpoint," but recommended continued avoidance of crowds and sick people.  *Id.* at PageID.437, 714.  At a March 2018 visit to the multispecialty clinic, Amy Filbrun, M.D., made similar observations and noted that L.E.'s weight was at the 40th percentile.  *Id.* at PageID.485-487.

At a June 2018 home visit, Early On social worker Pamela Schelkun and physical therapist Lynette Arons noted that L.E.'s physical strength and endurance had increased, that she was relatively healthy through flu season, and that she made steady gains with her weight.  *Id.* at PageID.572.  Thus, her restrictions for being in public had been lifted.  *Id.* In July 2018, Dr. Waier again said that L.E. was "doing great," noting that

16

she only occasionally needed albuterol for coughing and that her reflux was improving on Zantac.  *Id.* at PageID.759.  Physical examination findings were normal.  *Id.* at PageID.761.

In October 2018, Dr. Waier provided Eberle a letter directing L.E. to avoid clinic visits because of an increased risk of respiratory complications. *Id.* at PageID.713.  In his treatment notes, Dr. Waier explained that Eberle requested the letter because she was concerned about exposing L.E. to germs at WIC appointments.  *Id.* at PageID.754-755.  At that visit, physical examination findings were normal except for the hip hypotonia discussed above, and Dr. Waier noted that L.E. had no recent illnesses.  *Id.* at PageID.755-757.  While L.E. needed albuterol for her respiratory condition very rarely, Dr. Waier recommended another medication for cold season. *Id.* at PageID.754-755.

At a December 2018 visit to the multispecialty clinic, George Mychaliska, M.D., found that L.E. had done well since her last visit in May 2018, with no major respiratory exacerbations and no urgent care visits.  *Id.* at PageID.686.  Eberle reported that L.E. sometimes "sounds raspy in her chest" but that she responded well to albuterol, which she used about four times a week.  *Id.*  While Eberle reported keeping L.E. away from crowded areas because she often developed high fevers, Dr. Mychaliska observed

17

there were no reports of "identifiable infections or prolonged symptoms or illnesses."  *Id.*  And while Zantac had been discontinued, L.E. had no recurring reflux.  *Id.*  A physical examination was normal.  *Id.* at PageID.688.  Dr. Mychaliska saw no evidence of recurrent CDH but found that L.E. had a mild persistent asthma to be treated with Flovent and albuterol.  *Id.* at PageID.701.  Dr. Mychaliska also said L.E. should only limit contact with sick family members or friends but should not avoid family functions.  *Id.* at PageID.691.

In January 2019, L.E. saw Dr. Waier for a routine examination.  *Id.* at PageID.749.  He noted that her CDH was "doing great" with no restrictions and that her chronic coughing seemed improved with Flovent.  *Id.*  Physical examination findings were normal.  *Id.* at PageID.751.  At an April 2019 visit with Dr. Waier, Eberle reported no concerns with L.E.'s CDH and that there were no emergency or urgent care visits or albuterol use in the past year.  *Id.* at PageID.744.  Again, all physical examination findings were normal.  *Id.* at PageID.745.

L.E. saw Erin Perrone, M.D., at the multispecialty clinic in August 2019.  *Id.* at PageID.777.  Dr. Perrone stated that L.E. had done well and had no major respiratory exacerbations since her last visit in December 2018.  *Id.*  Eberle reported that she discontinued L.E.'s Flovent and that

18

she had last used albuterol in May 2019.  *Id.*  Yet L.E. had not been

coughing unless outside in the heat and humidity.  *Id.*  Her physical

examination and a chest x-ray showed normal results.  *Id.* at PageID.778.

Dr. Perrone concluded that L.E. was "doing fairly well from a respiratory

standpoint" but had difficulty with humid weather and other allergy

symptoms.  *Id.* at PageID.785.  She also noted a fluctuating appetite and

ongoing constipation, which she attributed to inadequate fiber intake.  *Id.* at

PageID.777, 780.  Dr. Perrone recommended increasing L.E.'s Miralax

dosage.  *Id.* at PageID.781.

This evidence showed no extreme limitation in health and physical

well-being.  L.E.'s CDH was not an ongoing issue, as multiple providers

stated she was doing well and Eberle admitted she had no concerns about

the condition.  *See id.* at PageID.241-248, 285-286, 437, 686, 701, 744,

749, 759, 777.  While L.E.'s providers recommended that she avoid

crowded areas and exposure to sick people in the months after surgery,

Early On noted that those restrictions were lifted by June 2018.  *Id.* at

PageID.275, 437, 572, 714.  In December 2018, Dr. Mychaliska stated that

L.E. should not avoid family gatherings.  *Id.* at PageID.691.  Although Dr.

Waier wrote a letter in October 2018 recommending that L.E. limit clinic

visits, he clarified that he wrote it at Eberle's request so she did not need to bring L.E. to WIC appointments. *Id.* at PageID.755.

Although L.E. had respiratory impairments, they appeared well controlled. L.E.'s providers repeatedly observed that she was doing well "from a respiratory standpoint." *Id.* at PageID.437, 487, 785. Eberle occasionally reported symptoms such as coughing, raspy breathing, and wheezing, but they were controlled with medication—and Eberle admitted she used albuterol rarely. *Id.* at PageID.436, 486, 686, 744, 749, 755, 759, 767. And L.E. had no major respiratory exacerbations requiring emergency room or urgent care visits. *Id.* at PageID.486, 686, 744, 777. While L.E. had respiratory infections in March 2018 and February 2019, those exacerbations were not severe. In March 2018, L.E. had a mild, intermittent cough, but on examination her lungs were mostly clear with no wheezing. *Id.* at PageID.767. And in February 2019, Dr. Waier recommended nasal saline drops, over-the-counter medication, and a humidifier to treat L.E.'s upper respiratory infection. *Id.* at PageID.703. No follow-up treatment was necessary on either occasion.

Eberle argues that L.E. has an extreme limitation in health and physical well-being because she developed a speech delay in mid-2019. ECF No. 16, PageID.822. The ALJ acknowledged Eberle's claim that L.E.

20

"ceased speaking" but stated there was "no reference to this in the medical notes."  ECF No. 12, PageID.62.  Although the medical records referred to Eberle's reports of L.E.'s recent difficulties with speech, the ALJ correctly noted the lack of evidence that L.E. was treated or evaluated for a speech delay.

In July and August 2019, Eberle reported to Early On and Dr. Waier that L.E. stopped speaking as much.  *Id.* at PageID.731, 780.  In September 2019, occupational therapist Moorehead found the intelligibility of L.E.'s verbal communication to be poor, noting Eberle's concern that L.E.'s speech had regressed and that she used only ten words.  *Id.* at PageID.795.  He recommended evaluation by a speech therapist.  *Id.*  In October 2019, Dr. Waier noted Eberle's concern that L.E. had "stopped with expressive language" and frequently babbled, while social worker Schelkun commented that L.E.'s speech skills were "beginning to show a delay."  *Id.* at PageID.727, 736.

At the hearing, Eberle stated that L.E. was to be evaluated by a speech therapist through Early On in October 2019.  *Id.* at PageID.85, 90.  But there is no evidence that this evaluation took place, let alone that L.E. had a diagnosed speech delay impacting her functioning in any domain.  Thus, Eberle's claims of a recent regression in L.E.'s speech abilities, as

21

weighed against the other evidence, do not establish an extreme limitation in this domain.  *See Cartwright v. Comm'r of Soc. Sec.*, No. 10-cv-13954, 2011 WL 4962413, at *5 (E.D. Mich. Oct. 19, 2011) ("The ALJ and magistrate judge's choice to not give prominence to the more recent downswing in behavior likely reflects a determination that, as weighed against other evidence, it was insufficient to establish a marked or extreme limitation in this domain.").

## IV.    Conclusion

The Court **RECOMMENDS** that Eberle's motion for summary judgment (ECF No. 16) be **DENIED**, the Commissioner's motion for summary judgment (ECF No. 17) be **GRANTED**, and the ALJ's decision be **AFFIRMED** under sentence four of 42 U.S.C. § 405(g).

s/Elizabeth A. Stafford
ELIZABETH A. STAFFORD
United States Magistrate Judge

Dated: June 21, 2022

## <ins>NOTICE TO THE PARTIES ABOUT OBJECTIONS</ins>

Within 14 days of being served with this report and recommendation, any party may serve and file specific written objections to this Court's findings and recommendations.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  If a party fails to timely file specific objections, any further appeal is waived.  *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991).  And only the specific objections to this report and recommendation are preserved for appeal; all other objections are waived.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991).

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this report and recommendation to which it pertains.  Within 14 days after service of objections, **any non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 21, 2022.

s/Marlena Williams
MARLENA WILLIAMS
Case Manager